**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**HARTFORD DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 20-20304 (JJT) |
| | ) | |
| CAMBRIDGE MARINE CONSTRUCTION, INC., | ) | |
| | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| BONNIE C. MANGAN, as Chapter 7 Trustee for CAMBRIDGE MARINE CONSTRUCTION, INC., | ) | Adv. Pro. Case No. 22-02006 (JJT) |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Re:  ECF Nos. 62, 63, 64, 80, 81, |
| MILAN PATEL and PATEL CONSTRUCTION, LLC, | ) | 82 |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF DECISION ON MILAN PATEL AND**
**PATEL CONSTRUCTION, LLC'S MOTION FOR SUMMARY JUDGMENT**

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

Before the Court is Defendants' Motion for Summary Judgment (ECF No. 62) (the "Motion"), filed on August 18, 2023. The Motion arises out of a dispute between the parties surrounding a transaction that occurred prior to Cambridge Marine Construction, Inc. (the "Debtor") filing a voluntary petition pursuant to Title 11 of the United States Code (the "Bankruptcy Code") under Chapter 7. The Chapter 7 Trustee, Bonnie C. Mangan, (the "Trustee"), duly appointed on March 2, 2020, brought this adversary proceeding as part of her duties in this case. The Trustee argues that a moderately-convoluted transaction involving Patel

Construction, LLC, ("Patel Construction") and its principal, Milan Patel, ("Patel", and with Patel Construction, the "Defendants"), as well as several other creditors, was improper as a fraudulent transfer, a preferential transfer, a breach of fiduciary duty, and/or an unfair trade practice. The Trustee also seeks, via a turnover claim, to recover a debt from Patel Construction.

The Defendants here responded to the assertions of fraudulent transfer and preferential transfer by denying that the Trustee can prove any of the elements of those claims. Additionally, the Defendants assert that several special defenses defeat those claims. Specifically, the Defendants argue that the subject transfers were earmarked such that the transfers fall within an exception, making them non-recoverable. Further, they argue that there is an additional missing element of the Trustee's preference claim—her reasonable due diligence. For the reasons that follow, the Defendants' Motion is denied.

Although there is an extensive factual background to the subject transaction, the Court begins with a brief summary of the factual allegations at the heart of this case, followed by a recitation of the specific undisputed and additional facts reviewed and relied upon by the Court for the purposes of summary judgment.[1]

### A. Summary of Factual Allegations

The Court believes the complexity of the transaction at issue requires a brief, non-exhaustive summary of the core facts alleged by the Plaintiff to properly contextualize the Court's analysis. The following factual summary is based entirely on the Plaintiff's Statement of Opposition Facts and the Plaintiff's Statement of Additional Facts. For the purposes of summary

---

[1] This Court looks to the Trustee's Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment (ECF No. 81) ("Plaintiff's Statement of Opposition Facts") as the principal source of the undisputed material facts. There are additional material facts, that are in dispute, that also guide the Court deliberations on the Motion. These are found in the Plaintiff's Statement of Opposition Facts, specifically at page 20 of that document ("Plaintiff's Statement of Additional Facts"). *See, infra,* Section III for the Court's reasoning as to why it turns, specifically, to these documents as the sources for undisputed and additional facts.

judgment, the Court herein weighs all factual assertions, disputes, and inferences of fact in favor of the Plaintiff. *See* D. Conn. L. Civ. R. ("Local Rule") 56.

The Debtor was a business that provided marine design and construction services. The Debtor and its principal, Jeffrey Johnson ("Johnson"), had a mentor/protégé relationship with Patel Construction through the Small Business Administration's ("SBA") 8(a) Business Development Program, which required Patel Construction to provide guidance to the Debtor. As part of this relationship, the Defendants served as guarantors for the Debtor on some loans, including various loans and a line of credit provided by Everett Bank. The Defendants also served as the indemnitors to sureties, including on the surety bonds issued by the North American Specialty Insurance Company ("NAS"). Patel Construction had also purchased a 40% equity interest in the Debtor for $75,000 in 2014.

By the second half of 2018, the Debtor was in financial distress. The sureties were paying subcontractor claims and the Defendants were liable on these claims as indemnitors. This situation worsened into 2019, with the Debtor laying off most of its employees and failing to pay payroll taxes when due. In response to the Debtor's mounting financial pressures, Patel arranged a transaction in April 2019 to extinguish or substantially diminish the Defendants' liability as guarantors and indemnitors for the Debtor's debts.

The transaction arranged by Patel involved a complex series of simultaneous transfers. At the core of the transaction is a $2,384,000 loan and a $350,000 line of credit from Avidia Bank. As part of this transfer, Avidia Bank required an appraisal of the Debtor. Patel organized and negotiated the loan and appraisal on the Debtor's behalf. Patel was the source of many of the accounting figures and projections used in the appraisal, as well as the condition and valuation of the Debtor's assets. Allegedly, the values and assertions provided by Patel that induced the loan

from Avidia Bank were—at best—material misrepresentations of the state of the Debtor's finances, of which Patel had thorough knowledge. The appraisal determined the value of Patel Construction's interest in the Debtor to be $1,354,000.

This loan was obtained for the reacquisition of Patel Construction's equity interest by the Debtor. To that end, approximately $1,045,000 of this loan was used to purchase Patel Construction's equity in the Debtor in a cash exchange. Patel Construction also received a $309,000 promissory note from the Debtor for the balance of the equity interest being repurchased. The Defendants directed Avidia Bank to pay the cash proceeds of the equity sale directly to NAS as payment on the Debtor's obligations under the NAS bonds. The Debtor then also used some of the proceeds of the $2,3840,000 loan from Avidia Bank to repay debts accruing to Everett Bank in the amount of $1,168,488.13. These transfers thereby extinguished a substantial amount of the Defendants' liability to Everett Bank and NAS as guarantor and indemnitor, respectively, for the Debtor's debts. The Defendants were not guarantors of the Avidia Bank loan.

The Defendants contend that these transfers were made out of benevolence: that the transaction was orchestrated as an attempt to save the Debtor, and that Patel Construction functionally relinquished its equity interest to assist in obtaining new loans simply to pay the Debtor's prior debts. The Plaintiff, on the other hand, contends that the transaction involved Patel defrauding a creditor to secure a loan for the Debtor for his sale of Patel Construction's overinflated shares in a failing company to pay debts on which the Defendants were liable as guarantors. The Plaintiff's argument is that the new loan was fraudulent on its face, and that any benefit to the Debtor or the prior creditors was merely incidental to a more than $2,000,000

decrease in the Defendants liability in prior debts that the Debtor was not otherwise paying and would likely be unable to pay in the future.

### B. Undisputed Material Facts

Based upon the Defendants' Local Rule 56(a)1 Statement of Undisputed Material Facts (ECF No. 63) and the Plaintiff's Statement of Opposition Facts, the Court has weighed these more-detailed undisputed facts propounded by both the Defendants and the Plaintiff for the purposes of summary judgment:[2]

1. On March 2, 2020 (the "Petition Date"), Cambridge Marine Construction, Inc. filed a voluntary petition under Chapter 7 of the Bankruptcy Code. Bk. Dkt. at ECF No. 1; Plaintiff's Statement of Opposition Facts at ¶ 1.

2. Upon the filing of the Debtor's bankruptcy case, Attorney Bonnie C. Mangan was appointed as the Chapter 7 Trustee of the Debtor's bankruptcy case. Bk. Dkt; Plaintiff's Statement of Opposition Facts at ¶ 2.

3. On February 11, 2022, the Trustee commenced the above-captioned adversary proceeding (the "Adversary Proceeding") by the filing of an Adversary Complaint (the "Complaint") against the Defendants. Adv. Proc. Dkt. at ECF No. 1; Plaintiff's Statement of Opposition Facts at ¶ 3.

---

[2] It is a generally recognized proposition of law that unanswered facts are considered conceded—*qui tacet consentit*. Defendants argued at a hearing on the Motion on November 16, 2023 (the "November Hearing") that their failure to file a response to the Additional Facts alleged by the Plaintiff was because Local Rule 56 does not explicitly provide for a response to the non-moving party's Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment. In any event, the Court deems it unnecessary to rule on this issue as the strictures of Local Rule 56(c) require the Court to "assume that a trier of fact would resolve all factual disputes in favor of the party opposing summary judgment." As a result, the issue is immaterial to the Court's ruling on the Motion as it is bound to "resolve all factual disputes in favor of the" Plaintiff regardless of Defendants' responsive facts. This is because the very act of Defendants asserting responsive facts would make those facts, by definition, disputed.

4.    On July 19, 2023, the Trustee filed an Amended Adversary Complaint (the "Amended Complaint") against the Defendants. Adv. Proc. Dkt. at ECF No. 56; Plaintiff's Statement of Opposition Facts at ¶ 4.

5.    Both the Complaint and the Amended Complaint allege that, on April 9, 2019, the Debtor transferred $1,045,000.00 to Patel Construction. Adv. Proc. Dkt. at ECF No. 1, ¶ 46; Adv. Proc. Dkt. at ECF No. 56, ¶ 46; Plaintiff's Statement of Opposition Facts at ¶ 5.

6.    On January 12, 2021, NAS filed a proof of claim in the Debtor's bankruptcy case asserting a claim against the Debtor's bankruptcy estate in the total amount of $5,792,278.40 (the "NAS Proof of Claim"). Bk. Dkt. Proof of Claim No. 26-1; Plaintiff's Statement of Opposition Facts at ¶ 10.

7.    The Report by the NAS provides that NAS received a payment from Baker Braverman and Barbadoro PC on April 10, 2019 in the amount of $1,008,170.23 for "Seller proceeds – Patel Constructions." Bk. Dkt. Proof of Claim No. 26-1 at 23–28; Bk. Dkt. Proof of Claim No. 26-1 at 27; Plaintiff's Statement of Opposition Facts at ¶¶ 12, 13.

8.    Patel Construction operated a general contracting business that was primarily engaged in construction projects for the federal government. Patel Aff. at ¶ 2; Plaintiff's Statement of Opposition Facts at ¶ 18.

9.    Patel is the president and sole member of Patel Construction. Patel Aff. at ¶ 1; Plaintiff's Statement of Opposition Facts at ¶ 19.

10.    The Debtor's principal, Johnson, was previously employed as an operational manager for Patel Construction in its Connecticut office from approximately 2005 to 2010. Patel Aff. at ¶ 5; Plaintiff's Statement of Opposition Facts at ¶ 22.

11.   On November 1, 2011, Johnson formed the Debtor. Patel Aff. at ¶ 6; Plaintiff's Statement of Opposition Facts at ¶ 23.

12.   The Debtor operated a business similar to Patel Construction and was engaged by the federal government for a number of construction contracts. Patel Aff. at ¶ 7; Plaintiff's Statement of Opposition Facts at ¶ 24.

13.   The Debtor also participated in the SBA's 8(a) Business Development Program (the "8(a) Program"). Patel Aff. at ¶ 8; Plaintiff's Statement of Opposition Facts at ¶ 25.

14.   On February 26, 2013, the Debtor and Patel Construction entered into a Mentor/Protégé Agreement, which was amended by an Amended and Restated Mentor/Protégé Agreement dated April 30, 2013, and a Second Amended and Restated Mentor/Protégé Agreement dated April 2, 2014 (together, the "MPA"). Patel Aff. at ¶ 9, Ex. A; Plaintiff's Statement of Opposition Facts at ¶ 26.

15.   On July 13, 2013, the Debtor and Patel Construction entered into a Surety Bond Assistance Agreement (the "Bond Agreement"), which required that Patel Construction, Patel, and Patel's spouse would execute an agreement of indemnity for contracts on which Patel Construction was to provide bonding support in order to assist the Debtor in obtaining bonds. Patel Aff. at ¶ 15, Ex. B; Plaintiff's Statement of Opposition Facts at ¶ 32.

16.   In order to increase the Debtor's bonding capacity by $1.5 million, and pursuant to the terms of the MPA, on April 8, 2014, Patel Construction purchased sixty-seven (67) shares of the Debtor for $75,000.00, amounting to a 40% interest in the debtor. Patel Aff. at ¶ 21; Patel Aff. at ¶ 22; Plaintiff's Statement of Opposition Facts at ¶¶ 38, 39.

17.    On July 12, 2018, Patel requested that Patel Construction's interest in the Debtor be reduced to 0%. Patel Aff. at ¶ 36, Ex. D; Plaintiff's Statement of Opposition Facts at ¶¶ 52, 54.

18.    Thereafter, Johnson and Patel sought out SBA lenders to finance the Debtor's purchase of Patel Construction's shares in the Debtor. Patel Aff. at ¶ 38; Plaintiff's Statement of Opposition Facts at ¶ 55.

19.    Ultimately, Avidia Bank made a proposal to provide the Debtor with an SBA Term Loan to purchase Patel Construction's interest in the Debtor and to refinance the Debtor's equipment and line of credit. Patel Aff. at ¶ 39; Plaintiff's Statement of Opposition Facts at ¶ 56.

20.    On November 16, 2018, Avidia Bank issued a term sheet (the "Term Sheet") for a Business Term SBA (7A) Loan to the Debtor in the total amount of $2,384,000.00 (the "Avidia Loan") and a $350,000.00 revolving line of credit. Patel Aff. at ¶ 44; Plaintiff's Statement of Opposition Facts at ¶ 61.

21.    The Debtor, Johnson, Johnson's spouse, Patel Construction, Patel, and Patel's spouse were all indemnitors on the bonds issued by NAS. Patel Aff. at ¶ 47; Plaintiff's Statement of Opposition Facts at ¶ 65.

22.    The same day, in accordance with the March Settlement agreement, Patel, on behalf of Patel Construction, directed Avidia Bank to pay $1,045,000.00 of the proceeds from the sale of Patel Construction's shares in the Debtor to NAS in order to satisfy the Debtor's outstanding obligations (the "Letter of Direction"). Patel Aff. at ¶ 53, Ex. K; Plaintiff's Statement of Opposition Facts at ¶ 71.

### *C.  Plaintiff's Additional Material Facts for Summary Judgment*

Based upon the Defendant's Local Rule 56(a)1 Statement of Undisputed Material Facts (ECF No. 63) and the Plaintiff's Statement of Opposition Facts, the Court also considers the following more-detailed additional material facts propounded by the Plaintiff for the purposes of summary judgment:

1.  On April 8, 2020, the Trustee telephonically conducted a meeting of creditors under 11 U.S.C. § 341, at which the principal of the Debtor, Johnson, appeared and testified on behalf of the Debtor. ECF No. 16. As the result of that testimony, the Trustee determined that further investigation into a certain transaction between the Debtor and Avidia Bank in April 2019 was warranted. Mangan Decl. ¶ 5; Plaintiff's Statement of Additional Facts at ¶ 1.

2.  Prior to the filing of this Adversary Proceeding, the Trustee's counsel reviewed all documents produced by Pfeil. Mangan Decl. ¶ 9; Plaintiff's Statement of Additional Facts at ¶ 5.

3.  The SBA Agreement contained specific supervisory obligations for Patel Construction, as Mentor, including, but not limited to, the following:

    > Protégé requires assistance with "project management and field operation support." . . .
    > To address Protégé's needs stated in 1.a., Mentor will provide Protégé with "project management and field operation support."
    > ***
    > Protégé also requires assistance to overcome obstacle of a "lack of capital." (Business Plan at p. 13), which includes "loans at low or no interest rates on a project by project basis to allow [Protégé] to complete projects and increase its line of credit." . . .
    > To address Protégé's needs stated at 1.b. ("lack of capital"), Mentor will provide Protégé with "loans at low or no interest rates on a project by project basis to allow [Protégé] to complete projects and increase its line of credit."
    > ***

Protégé requires assistance to overcome obstacle of "lack of an administrative/HR organization" (Business Plan at p. 3), including a need for "training and employee manual established," and a "lack of general administrative experience, including accounting, bookkeeping, and recordkeeping.". . .

To address Protégé's needs stated in 1.d. ("lack of an administrative/HR organization" and "lack of general administrative experience, including accounting, bookkeeping, and recordkeeping"), Mentor will provide Protégé assistance through the services of Milan M. Patel and other staff provided by Mentor, with accounting and financial management, including the preparation of financial statements, financial accounting and reporting, payroll, accounts payable and receivable, preparation of operating budgets and cost projects, cost and fixed-price accounting, and preparation of financial reports to Protégé's owner(s). Mentor will charge Protégé a reduced fee for the provision of such services on terms which are more favorable to Protégé than found in the commercial marketplace.

***

Protégé also requires planning assistance to overcome weakness to "[e]nsure that competitive business acquisitions, win-strategy plans are developed and implemented." . . .

To address Protégé's needs stated in 1.a. ("Ensure that competitive business acquisitions, win-strategy plans are developed and implemented"), Mentor will share with Protégé the business development (pipeline) tracking methods used by itself. Mentor will also introduce Protégé to potential customers and provide assistance with marketing methods.

Ex. A to Patel Aff., pp. 3–11; Plaintiff's Statement of Additional Facts at ¶ 17.

4.   There were also areas in the SBA Agreement where Patel admitted, or affirmatively claimed, he did nothing to fulfill his Mentor obligations. *See, e.g.*, Patel Tr. 64:15-19; Plaintiff's Statement of Additional Facts at ¶ 19.

5.   In addition, based upon a review of the Debtor's records, by December 2017, Patel Construction had borrowed and never repaid at least $158,329.00 from the Debtor. Mangan Decl. ¶ 27. *Id.*, Ex. D; Plaintiff's Statement of Additional Facts at ¶ 20.

6.   Patel was the sole member of Patel Construction, so Patel Construction could not act in furtherance of its Mentor obligations except through Patel Construction and fiduciary duties owed to the Debtor. Patel Tr. 11:7–22; Plaintiff's Statement of Additional Facts at ¶ 23.

7.    Patel Construction and the Debtor borrowed $250,000 from Everett Bank. Kornafel Decl.,

       ¶ 3, Ex. A, Ex. 5 to Patel Tr. ("Everett Bank Loan"); Plaintiff's Statement of Additional

       Facts ¶ 27.

8.    Patel Construction and the Debtor had access to a line of credit for up to $1.5 million with

       Everett Bank. *Id.*, Ex. 4 to Patel Tr. ("Everett Bank Line of Credit"); Plaintiff's Statement

       of Additional Facts ¶ 28.

9.    Patel provided an unlimited guaranty on a loan from Everett Bank to the Debtor and Patel

       Construction. *Id.*, Ex. 6 to Patel Tr. ("Patel Guaranty Agreement"); Plaintiff's Statement of

       Additional Facts ¶ 30.

10.   At the time of his deposition, Patel had no idea what he, his company, and his spouse were

       owed as indemnitors, and he could not substantiate the bases and reasons for the funds

       Patel directed Johnson to transfer to Patel's bank account over the years. Patel testified at

       his deposition that Patel Construction, Patel, and Patel's spouse were paid at least $500,000

       for this indemnity "service" but he was not sure if it was over $600,000. Patel alleged that

       he had provided his counsel with document supporting the amount of compensation he'd

       received under the Bond Agreement. *Id.*, Patel Tr. 73:6–74:3. Patel could not recall the

       exact amount of "indemnitor" fees ultimately paid by the Debtor, but he did not produce

       any documents to substantiate any fees received pursuant to the terms of the Bond

       Agreement. *Id.*, Patel Tr. 75:3–76:5. *See also* Mangan Decl. ¶ 26; Plaintiff's Statement of

       Additional Facts at ¶ 38.

11.   In addition, the Debtor leased space in New Haven from a Patel-related entity, HHC I

       Cambridge, LLC, with a term commencing January 24, 2017, with monthly rent of

       $19,250.00. Again, Patel could not remember how much his entity received from the

       Debtor over the term of the lease, or when the Debtor vacated the premises, but it

presumably received at least a few months of rent at a minimum from the Debtor. *Id.*, Patel Tr. 65:17–70:20; *see* Ex. 62 to Patel Tr., (Lease for 24 River St., New Haven); Plaintiff's Statement of Additional Facts at ¶ 40.

12. Patel emailed his bonding agent multiple times seeking to have the Defendants and Patel's spouse released as indemnitors under the bond as early as the spring of 2017. Kornafel Decl. ¶ 3, Ex. A, Exs. 20, 21, and 22 to Patel Tr. (Various Letters and Emails from Patel); Plaintiff's Statement of Additional Facts at ¶ 41.

13. In July 2018, Patel asked Johnson that Patel Construction's ownership stake in the Debtor be reduced to zero. Kornafel Decl. ¶ 3, Ex. A, Ex. 29 to Patel Tr. (July 12, 2018 Email); Plaintiff's Statement of Additional Facts at ¶ 42.

14. By no later than August 2018, Patel also knew that the surety had begun paying subcontractor claims for funds owed by the Debtor. Kornafel Decl. ¶ 3, Ex. A, Ex. 68 to Patel Tr. ("NAS Demand Letters"); Plaintiff's Statement of Additional Facts at ¶ 43.

15. Patel had knowledge of the Debtor's worsening financial condition as late as August 2018 and concerns about Johnson's ability to manage the Debtor's finances. Kornafel Decl. ¶ 3, Ex. A, Ex. 23 to Patel Tr. (Emails in August 2018); Plaintiff's Statement of Additional Facts at ¶ 44.

16. In August 2018, as the Debtor's financial condition continued to spiral downward, Patel Construction directly paid one of the Debtor's subcontractors, Billy G's Heating and Air Conditioning ("Billy G's"), and had the Debtor and Johnson sign a secured promissory note in the amount of $132,875 for that obligation. Kornafel Decl. ¶ 3, Ex. A, Ex. 24 to Patel Tr. (Secured Promissory Note Dated August 22, 2018); Plaintiff's Statement of Additional Facts at ¶ 45.

17.   Patel was the primary, if not the only, line of communication between Avidia Bank and the Debtor. Avnish Patel at Avidia Bank emailed Patel, not Johnson, on November 9, 2018, to offer the Debtor with Avidia Bank's loan proposal. Id., Ex. 37 to Patel Tr. (Nov. 9, 2018, Email); Plaintiff's Statement of Additional Facts at ¶ 46.

18.   Avidia Bank retained two appraisers at Reliant in connection with the Avidia Bank loan. Rohul Patel, an appraiser for Reliant, prepared an appraisal of the Debtor's equipment. Ex. B to Kornafel Decl., ¶ 4, Transcript of Deposition of Rohul Patel (hereinafter, "Rohul Tr."). Ex. 322 to Rohul Tr. (Reliant Engagement Letter with Avidia Bank – Equipment). Neal Patel, a different appraiser for Reliant, prepared a business valuation of the Debtor. Kornafel Decl. ¶ 5, Ex. C, Ex. 306 to Neal Tr. (Reliant Engagement Letter with Avidia Bank – Business Valuation); Plaintiff's Statement of Additional Facts at ¶ 47.

19.   Patel, not Johnson, emailed or spoke with employees at Reliant that Avidia Bank retained as part of its due diligence concerning the Debtor. *See, e.g.*, Kornafel Decl. ¶ 5, Ex. C, Supplemental Questionnaire from Reliant to Debtor, Exhibit 302 to Neal Tr.; Neal Tr. 41:17-42:3. *See also* Kornafel Decl. ¶ 4, Ex. B, Rohul Tr. 11:24–12:12; 14:10-25; Plaintiff's Statement of Additional Facts ¶ 48.

20.   Rohul Patel appraised the equipment as having a fair market value of $1,882,100. Kornafel Decl. ¶ 4, Ex. B, Ex. 311 to Rohul Tr. ("Equipment Appraisal"); Plaintiff's Statement of Additional Facts at ¶ 52.

21.   Johnson informed Patel that "[a] lot of equipment is gone," but although he knew the previously supplied equipment list was not accurate, Patel never told Rohul Patel that the Debtor was no longer in possession of certain pieces of substantial equipment. Kornafel

Decl. ¶ 3, Ex. A, Ex. 55 to Patel Tr. (Emails Oct. 18, 2018). Patel Tr. 185:21–200:20; Plaintiff's Statement of Additional Facts at ¶ 53.

22. The equipment list Rohul Patel relied on for his equipment appraisal included vehicles the Debtor no longer had in its possession as of the equipment appraisal date. Kornafel Decl. ¶ 4, Ex. B, Ex. 311 to Rohul Tr. (Equipment Appraisal, p. 18); Plaintiff's Statement of Additional Facts at ¶ 55.

23. Patel also never provided the Reliant team with a copy of the updated equipment list with four pieces stricken from the list by Johnson, even though Charisse Reyes at Reliant had asked him to confirm that the list was complete. Kornafel Decl. ¶ 3, Ex. A, Ex. 55 to Patel Tr. (Emails Oct. 18, 2018). Patel Tr. 185:21-200:20; see also Kornafel Decl. ¶ 11, Ex. J (Email from Charisse Reyes on Oct. 18, 2018, at 5:00 p.m.); Plaintiff's Statement of Additional Facts at ¶ 56.

24. The machinery that was no longer in the Debtor's possession at the time the equipment appraisal was performed were the two Caterpillar pieces of machinery (an excavator appraised at $410,000 and a hammer attachment appraised at $100,000), and two trailers appraised at $22,000 and $23,000, respectively. The total value of that machinery that was no longer in the Debtor's possession when the appraisal was performed was valued at $555,000. Kornafel Decl. ¶ 3, Ex. A, Ex. 55 to Patel Tr. (Emails Oct. 18, 2018); *id.*, Patel Tr. 186:18–192:17 (questioning regarding four pieces of equipment that were most likely not in the Debtor's possession at the time of the equipment appraisal); Plaintiff's Statement of Additional Facts at ¶ 57.

25. Neal Patel appraised the business value of the Debtor at $3,860,000. This figure plugged in Rohul Patel's equipment appraisal total for the machinery at $1,882,100. Kornafel Decl.

¶ 5, Ex. C, Ex. 301 to Neal Tr. (Business Valuation Report), pp. 3, 6, 89 (fixed asset valuation of $1,882,100 included in appraiser's value conclusion of $3,860,000). *Id.*, Neal Tr. 52:2–13; Plaintiff's Statement of additional Facts at ¶ 60.

26. Patel answered the Supplemental Questionnaire. Question number 2 under "Financial" on the Supplemental Questionnaire ask, "Per projections received by the appraiser, 2018 revenues are projected to be $6MM. Please explain why these projections are accurate." In his response, Patel wrote "Cambridge Marine is in negotiations with owners on several large projects which will be awarded within the 4QT 2018." Neal Patel was provided nothing to support these projections. Kornafel Decl. ¶ 5, Ex. C, Neal Tr. 42:25–44:24; *id*., Ex. 302 to Neal Tr. (Supplemental Questionnaire); Plaintiff's Statement of Additional Facts at ¶ 63.

27. The Amended Stock Redemption Agreement provided that the Debtor was to purchase and redeem Patel Construction's 67 shares in the Debtor. The redemption price was $1,354,000.00 (the "Redemption Price"). Patel Aff. at ¶ 45, Ex. G; Plaintiff's Statement of Additional Facts at ¶ 69.

28. The Redemption Price was based on Reliant's business valuation. Kornafel Decl. ¶ 3, Ex. A, Patel Tr. 202:14–206:10; Kornafel Decl. ¶ 5, Ex C, Ex. 301 to Neal Tr. (Business Valuation Report); Kornafel Decl. ¶ 3, Ex A, Ex. 25 to Patel Tr. (Stock Redemption Agreement Dated November 18, 2018). *See also* Patel Aff. at ¶ 45, Ex. G; Plaintiff's Statement of Additional Facts at ¶ 70.

29. The Redemption Price was to be paid in two ways. The first part of the stock redemption price was to be paid by wiring $1,045,000.00 to Patel Construction. The second part of the stock redemption price was to be paid by the Debtor through a $309,000.00 promissory

note to Patel Construction. Patel Aff. at ¶ 45, Ex. G, p. 1 (PATEL000227); Plaintiff's Statement of Additional Facts at ¶ 71.

30. In early April 2019, Johnson told Mulcahy that Patel had been the individual at the Debtor who was in charge of the finances. *Id.*, Mulcahy Tr. 120:10–121:5; Plaintiff's Statement of Additional Facts at ¶ 75.

31. The financial records provided to Mulcahy reflected that the Debtor had incurred a loss of $600,000 in 2018 and that the Debtor was not a profitable company. *Id.*, Mulcahy Tr. 101:16–102:2; Plaintiff's Statement of Additional Facts at ¶ 76.

32. On April 9, 2019, the Debtor borrowed $2,384,000.00 from Avidia Bank as an SBA business term loan (the "Avidia Term Loan"). Kornafel Decl. ¶ 3, Ex. A, Ex. 53 to Patel Tr. (Settlement Statement Dated April 9, 2019); Plaintiff's Statement of Additional Facts at ¶ 77.

33. At the same time, the Debtor borrowed $350,000.00 from Avidia Bank as a revolving line of credit (the "Avidia LOC"). Kornafel Dec. ¶ 9, Ex. H (Revised Commitment Letter); Plaintiff's Statement of Additional Facts at ¶ 78.

34. The purpose of the Avidia Term Loan and the Avidia LOC was to buy out Patel Construction's ownership interest in the Debtor. Patel Aff. at ¶ 44, Ex. F. ("Patel Construction Transaction"); Plaintiff's Statement of Additional Facts at ¶ 79.

35. At the time of the closing on the loan from Avidia Bank, Patel Construction had control over where the $1,045,000.00 to be paid to Patel Construction as a buyout of its ownership interest in the Debtor was to go. Kornafel Decl. ¶ 3, Ex. A, Patel Tr. 226:7–248:4; Plaintiff's Statement of Additional Facts at ¶ 82.

36. Some of the proceeds of the Avidia Term Loan and Avidia LOC were used to pay off the Everett Bank Loan and Everett Line of Credit in the amount of $1,168,488.13. Kornafel Decl. ¶ 3, Ex. A, Ex. 53 to Patel Tr. (Settlement Statement Dated April 9, 2019); Plaintiff's Statement of Additional Facts at ¶ 83.

37. As a result of this payoff, Patel Construction no longer has any liability on the Everett Bank Loan or Everett Line of Credit. Everett Bank Loan or Everett Line of Credit Patel Tr. 245:11–248:4; Plaintiff's Statement of Additional Facts at ¶ 84.

38. As a result of the Avidia Bank loan, the Debtor's liabilities increased by $417,405 at a minimum. Mangan Decl. ¶ 19, Exhibit B, F56-AB56; Plaintiff's Statement of Additional Facts at ¶ 85.

39. Net operating income ("NOI") does not account for a company's debt service and NOI must be sufficient to cover debt service. In this case, the Debtor's 2019 Balance Sheet (Exhibit B) reveals that in 2019, the Debtor was carrying substantial debt. Among the more significant debt liability entries is the entry "Everett BANK SBA LOC" (Current Liabilities, item 2502), which was in excess of $320,000 throughout 2019. Also significant is the debt liability entry "Everett Bank LOC-Equip" (Current Liabilities Item 2503), which was $626,173.05 from April through December (and higher in January and February). Exhibit B, F55-AB55. In addition, the Debtor's loan from Avidia Bank added $417,405 to Debtor's debt liabilities in April 2019 (and more later in the year). Exhibit B, F56-AB56. The Debtor's NOI could not support debt service for the level of debt that Debtor was carrying in 2019. Mangan Decl. ¶ 19, Ex. B. There are other indicia of the Debtor's insolvency in 2019. The Debtor's records reveal that the Debtor failed to pay payroll taxes in 2018 and 2019, including payroll taxes due at about the time of the Patel Construction

Transaction in late April 2019. Mangan Decl. ¶ 19, Ex. B; Plaintiff's Statement of Additional Facts at ¶ 91.

40.    There are other indicia of the Debtor's insolvency in 2019. The Debtor's records reveal that the Debtor failed to pay payroll taxes in 2018 and 2019, including payroll taxes due at about the time of the Patel Construction Transfer in late April 2019. Mangan Decl. ¶ 20; Plaintiff's Statement of Additional Facts at ¶ 92.

41.    In 2018 and 2019, the Debtor maintained a business checking account with Navy Federal Credit Union, accounting number ending 5272 (the "NFCU Account"). The Trustee's review of 2018 and 2019 NFCU Account monthly statements reveals that the Debtor frequently issued checks without sufficient funds leading to declined (*i.e.* "bounced") checks and the imposition of returned check fees charged against the account. Specifically, the numbers of checks declined in 2019 are as follows: nine checks in January; 13 checks in May; 24 checks in July; 14 checks in August; and five checks in September. The account balance went down to zero in September 2019. There were, however, no declined checks in April 2019. Copies of the NFCU Account statements for these months are annexed in Exhibit C to the Mangan Declaration. Mangan Decl. ¶ 21, Ex. C; Plaintiff's Statement of Additional Facts at ¶ 93.

42.    The Debtor's 2019 Balance Sheet (Exhibit B) suggests on face value that, from a balance sheet perspective, the Debtor was solvent in 2019. However, the Debtor was not actually solvent from a balance sheet perspective at any point in time during 2019. Many of the figures in the QuickBooks generated Balance Sheet, particularly on the assets side, are dubious and highly questionable and cannot in my view be relied upon. Just by way of example, under Current Assets, the Debtor was carrying "Costs In Excess of Billings" in

the amount of $2,283,727.00 every single month during 2019 and in the first three months of 2020 right up to the Debtor's bankruptcy filing. Insofar as that figure represents the potential purported income value of completed but unbilled work. Furthermore, there is nothing in the Debtor's financial records that would serve to confirm that the Costs in Excess of Billings carried on the Debtor's Balance Sheet in 2019 was a bona fide asset. Finally, although the Cost in Excess of Billings is carried on the Balance Sheet right up to the bankruptcy filing, there is no equivalent record in Debtor's bankruptcy schedules. Mangan Decl. ¶ 22; Statement of Additional Facts at ¶ 94.

43. Adjusting the balance sheet to exclude "Costs in Excess of Liabilities" from Debtor's assets and excluding "Loan Due" and "Less Current Matrururities of Lon" [sic] from Debtor's Long-Term Liabilities, and Total Liabilities leaves Debtor with Total Liabilities in excess of Total Assets for eleven out of twelve months in 2019, and the only month where liabilities did not exceed assets was March. Applying such exclusions, liabilities exceeded costs in April 2019 by $134,154.04. The Debtor's financial condition deteriorated steadily from April through the end of the year and by December 31, 2019, the Debtor's liabilities exceeded its assets by $742,916.85 (again, after excluding "Costs in Excess of Liabilities" from total assets and "Loan Due" and "Less Current Matrururities of Lon" from the Debtor's Long Term Liabilities). Mangan Decl. ¶ 24. The Debtor's 2018 monthly balance sheet exhibited the same problems identified above. Applying the same adjustments, Debtor appears to have been balance-sheet insolvent throughout 2018 (in December 2018, Debtor's liabilities exceeded its assets by $737,047.60). Mangan Decl. ¶ 23; Plaintiff's Statement of Additional Facts at ¶ 98.

44. At the time of the Patel Construction Transaction, the Debtor could not meet its payroll tax obligations, nor could the Debtor meet its other financial obligations as they came due. *See*, *e.g.*, Bankruptcy Case Proof of Claim No. 22 (Nate Westall Proof of Claim); Bankruptcy Case Proof of Claim No. 29 (MA Dept. of Unemployment Assistance Proof of Claim); Plaintiff's Statement of Additional Facts at ¶ 100.

45. Considering and excluding the Balance Sheet irregularities described above, the Debtor was insolvent on a balance sheet basis at the time of the Patel Construction Transaction in 2019 and all times thereafter until the Debtor filed bankruptcy in March 2020. Mangan Decl. ¶ 25; Plaintiff's Statement of Additional Facts at ¶ 99.

## II.    JURISDICTION

The United States District Court for the District of Connecticut has original jurisdiction over the instant adversary proceeding pursuant to 28 U.S.C. § 1334(b). This Court possesses the authority to hear and determine the proceeding in reference from the District Court pursuant to 28 U.S.C. § 157(a), (b)(1), and the General Order of Reference of the District Court dated September 21, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## III.    STANDARD OF REVIEW

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56 applicable in adversary proceedings. Federal Rule of Civil Procedure 56 requires the Court to grant summary judgment if the pleadings, depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other related material show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A). The rule further provides that "[a] party asserting that a fact cannot be . . . genuinely disputed" may also support that assertion by "showing that the materials cited do not establish the presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *see also Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment"). A material fact is one that might affect the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Made applicable by Local Bankruptcy Rule 7056-1, Local Rule 56(a)1 provides that each undisputed fact must be supported by citation to admissible record evidence and set forth in a Local Rule 56(a)1 Statement of Undisputed Material Facts. *See also* Local Rule 56(a)3. Under Local Rule 56(a)2, a party opposing summary judgment must file admissions or denials of the facts provided in the Local Rule 56(a)1 Statement of Undisputed Material Facts set forth in a Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment with a separate section entitled "Additional Material Facts" setting forth additional facts that the non-moving party contends establish genuine issues of material fact precluding summary judgment. Importantly, the Court is bound by Local Rule 56(c) to "assume that a trier of fact would resolve all factual disputes in favor of the party opposing summary judgment." Local Rule 56(c) further provides:

> All admissible evidence favorable to the party opposing the motion (including direct, indirect, and circumstantial evidence, and evidence admissible only for a limited purpose such as impeachment), and all permissible inferences based on such evidence, must be credited if such evidence and inferences could be credited by a trier of fact. The Court must disregard all evidence supporting the moving party that the jury would not be required to believe with regard to a disputed issue of fact, and must resolve all credibility questions in favor of the party opposing summary judgment.

The burden is on the movant to clearly establish the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, (1986) ("In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts immaterial"). The moving party may satisfy this burden "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). If the moving party satisfies that burden, the non-movant must establish the existence of a genuine issue of material fact requiring a trial. *Matsushita Elec. Indus. Co. v. Zenith radio Corp.*, 475 U.S. 574, 586–87 (1986). Summary judgment is therefore appropriate if the non-movant party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex*, 477 U.S. at 323. Further, the Court makes no findings regarding those facts not included herein and recites only those facts sufficient to make a determination on the various counts and claims presented in this motion for summary judgment.

To the extent that the Trustee argued at oral argument that the Defendants' failure to file a response to Plaintiff's Statement of Opposition Facts constitutes a concession of those facts for summary judgment, the Court finds that argument is immaterial, and respectfully declines to deem these alleged material facts undisputed. The Court however is bound by Local Rule 56(c) to resolve all factual disputes in favor of the Plaintiff for purposes of this Motion such that the Court would have to "favor" the Plaintiff's factual assertions to the Defendants' responsive facts, regardless of whether objections and responsive facts were filed.

## IV.   DISCUSSION

For simplicity and efficiency, the Court addresses the Counts out of order relative to their presentation in the Amended Complaint (ECF No. 56). Similarly, as the parties allege some 175 facts between them in the Defendants' Local Rule 56(a)1 Statement of Undisputed Material Facts (ECF No. 63) and the Plaintiff's Statement of Opposition Facts, the Court will examine only those material facts that provide a genuine dispute of fact necessitating a trial.

### A. Evidentiary and Admissibility Issues

Defendants vigorously contended at oral argument during the November Hearing that the

QuickBooks journal entries cited in, among other things, Patel's deposition (ECF No. 81-1, Ex. A)

are inadmissible hearsay due to their lack of trustworthiness.

> In ruling on a motion for summary judgment, a court need only consider admissible
> evidence. *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997). . . . To be admissible
> as business records, the documents must have been made near the time of the
> recorded event by someone with knowledge and must have been kept in the course
> of regularly conducted business activity. Fed. R. Evid. 803(6)(A)–(B). In addition,
> it must have been the regular practice of that business activity to make them. Fed.
> R. Evid. 803(6)(C). Even if the documents meet all of these requirements, "if the
> source of information or the method or circumstances of preparation indicate [a]
> lack of trustworthiness, such records may be excluded." *Hodges v. Keane*, 886 F.
> Supp. 352, 356 (S.D.N.Y. 1995) (citation omitted); Fed. R. Evid. 803(6)(E).

*Parks v. Blanchette*, 144 F. Supp. 3d 282, 292 (D. Conn. 2015). Further, "'[i]n all cases, the

principal precondition to admission of documents as business records pursuant to Fed. R. Evid.

803(6) is that the records have sufficient indicia of trustworthiness to be considered reliable.'

The determination is left to the sound discretion of the trial court." *Elsevier B.V. v. UnitedHealth*

*Grp., Inc.*, 784 F. Supp. 2d 286, 292 (S.D.N.Y. 2011) (citations omitted).

Although trustworthiness is a lodestone of the admissibility analysis under Fed. R. Evid.

803(6), "[t]he business records exception has been construed generously in favor of

admissibility, due to the general trustworthiness of regularly kept records and the need for this

type of evidence in many cases." *Arista Recs. LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 421

(S.D.N.Y. 2011) (citations omitted).

Patel himself testified that the documents were made near the time of the recording, by a

person with knowledge, and in the course of regularly conducted business (ECF No. 81-1,

Ex. A). These are indicia of trustworthiness. Further, Patel's credibility regarding this matter is

an issue that Local Rule 56(c) requires the Court to weigh in favor of the non-moving party, the

Trustee. Additionally, the Court is disturbed by the proposition that sophisticated parties, such as the Defendants, may avoid liability for alleged financial wrongdoing by barring the admission of documents they allegedly had some part in compiling simply by pointing out the negligent or fraudulent information contained within said documents. As a result, the Court deems these documents admissible for the purposes of this summary judgment motion.

### B. *Fraudulent and Preferential Transfer Claims*

In Counts One and Two of the Amended Complaint, the Trustee alleges claims of both intentional and constructive fraudulent transfer under Bankruptcy Code § 548(a)(1) against both Defendants. Similarly, in Counts Three and Four of the Amended Complaint, the Trustee alleges claims of both intentional and constructive fraudulent transfer under Conn. Gen. Stat. § 52-552e(a) of the Connecticut Uniform Fraudulent Transfer Act against both Defendants.[3] The CUFTA claims are made applicable in bankruptcy proceedings under Bankruptcy Code §§ 544(b)(1) and 502. In Count Seven, the Trustee also alleges a preference under Bankruptcy Code § 547.

The Defendants raise several affirmative defenses that are applicable to Counts One, Two, Three, Four, and Seven. Specifically, Defendants make two arguments. First, that there is an exception for fraudulent and preferential transfer claims that applies to transfers that were appropriately earmarked for payment to a creditor. Second, that the claims are nonrecoverable under the provisions of Bankruptcy Code § 550. These issues are discussed, at length, in their own subsections.

As many of the elements of fraudulent transfers under the Bankruptcy Code also apply to the CUFTA and preference claims against Patel Construction, the analysis of those duplicative

---

[3] The Connecticut Uniform Fraudulent Transfer Act is found at Conn. Gen. Stat. § 52-552, *et seq*. ("CUFTA").

elements is considered incorporated herein. The additional elements of a preference will be

addressed at the end of the section.

1. <u>Statutory Law on Avoidance Actions</u>

Bankruptcy Code § 548(a)(1) provides the elements of fraudulent transfer claims.

Specifically, Bankruptcy Code § 548(a)(1) provides that the trustee may avoid any transfer of an

interest of the Debtor within two years before the date of the filing of the petition if the debtor

voluntarily or involuntarily:

> (A) made such transfer or incurred such obligation with actual intent to hinder,
> delay, or defraud any entity to which the debtor was or became, on or after the date
> that such transfer was made or such obligation was incurred, indebted; or
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer
> or obligation; and
>> (ii)(I) was insolvent on the date that such transfer was made or such obligation
>> was incurred, or became insolvent as a result of such transfer or obligation;
>>> (II) was engaged in business or a transaction, or was about to engage in
>>> business or a transaction, for which any property remaining with the debtor
>>> was an unreasonably small capital;
>>> (III) intended to incur, or believed that the debtor would incur, debts that
>>> would be beyond the debtor's ability to pay as such debts matured; or
>>> (IV) made such transfer to or for the benefit of an insider, or incurred such
>>> obligation to or for the benefit of an insider, under an employment contract
>>> and not in the ordinary course of business.

CUFTA § 52-552e(a) provides the elements of fraudulent transfer claims under CUFTA.

Specifically, it provides that:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor,
> if the creditor's claim arose before the transfer was made or the obligation was
> incurred and if the debtor made the transfer or incurred the obligation:
>> (1) With actual intent to hinder, delay or defraud any creditor of the debtor;
>> or
>> (2) without receiving a reasonably equivalent value in exchange for the
>> transfer or obligation, and the debtor
>>> (A) was engaged or was about to engage in a business or a
>>> transaction for which the remaining assets of the debtor were
>>> unreasonably small in relation to the business or transaction, or
>>> (B) intended to incur, or believed or reasonably should have
>>> believed that he would incur, debts beyond his ability to pay as they
>>> became due.

CUFTA § 52-552e(a). CUFTA § 52-552e(b) provides some of the factors that may be considered in determining actual intent, stating:

> In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The Trustee further alleges, concurrently or alternatively to § 52-552e(a)(2), that the transfers were constructively fraudulent under CUFTA § 52-552f(a), which provides alternative elements of constructive fraudulent transfer. CUFTA § 52-552f(a) provides that:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

With regard to preferences, Bankruptcy Code § 547(b) provides that:

> [T]he trustee may, based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), avoid any transfer of an interest of the debtor in property—
> > (1) to or for the benefit of a creditor;
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> > (3) made while the debtor was insolvent;
> > (4) made—
> > > (A) on or within 90 days before the date of the filing of the petition; or

> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if—
>
> > (A) the case were a case under chapter 7 of this title;
> >
> > (B) the transfer had not been made; and
> >
> > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Trustee attempts to recover the value of the transaction in the claims brought under Bankruptcy Code §§ 547 and 548 through Bankruptcy Code § 550(a), which provides that:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2) any immediate or mediate transferee of such initial transferee.

This section operates in conjunction with Bankruptcy Code § 551, which provides that "[a]ny transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to the property of the estate."

## 2. Intentional Fraudulent Transfer Claims

The elements of intentional fraudulent transfer under the Bankruptcy Code are: (i) there was a transfer of an interest of the debtor in property; (ii) this transfer was made within two years of the petition date; and (iii) that the transfer was made with an actual intent to hinder, delay, or defraud a creditor. To prevail at trial, the Trustee must prove the elements of intentional fraudulent transfer under Count One by the preponderance of the evidence. *Geron v. Craig (In re Direct Access Partners, LLC*, 602 B.R. 502, 539–40 (Bankr. S.D.N.Y. 2019); *see also Grogan v. Garner*, 498 U.S. 279, 289–90 (1991). Regarding Count Three of the Amended Complaint, Connecticut law requires the Trustee prove the same three elements by clear and convincing

evidence. *O'Neil v. N.E. Road, Inc. (In re Neri Bros. Constr. Corp.)*, 593 B.R. 100, 141 (Bankr.

D. Conn. 2018) (citing *Jacobowitz v. Jacobowitz*, 102 Conn. App. 332, 341, 925 A.2d 424, 430

(2007)).

It is undisputed that there was a transfer of an interest of the property of the Debtor and

that this transfer was made within two years of the petition date.[4] The only disputed element is

whether the transfer was made with an actual intent to hinder, delay, or defraud a creditor.

The process of determining whether the transfer was made with an actual intent to hinder,

delay, or defraud a creditor requires a "fact intensive" review. *CPY Co., v. Ameriscribe Corp. (In*

*re Chas P. Young Co.)*, 145 B.R. 131, 136 (Bankr. S.D.N.Y. 1992).

> To overcome the difficulty inherent in establishing fraudulent intent, a plaintiff
> "may rely on 'badges of fraud'—'circumstances so commonly associated with
> fraudulent transfers that their presence gives rise to an inference of intent.'" *In re*
> *Bos. Generating LLC*, 617 B.R. 442, 472 (Bankr. S.D.N.Y. 2020) (quoting *Techno-*
> *Comp. Inc. v. Arcabascio*, 130 F. Supp. 3d 734, 745 (E.D.N.Y. 2015)). "Badges of
> fraud" include:
>
>> (1) the lack or inadequacy of consideration; (2) the family, friendship or
>> close associate relationship between the parties; (3) the retention of
>> possession, benefit or use of the property in question; (4) the financial
>> condition of the party sought to be charged both before and after the
>> transaction in question; (5) the existence or cumulative effect of a pattern or
>> series of transactions of conduct after the incurring of debt, onset of
>> financial difficulties, or pendency or threat of suits by creditors; and (6) the
>> general chronology of the events and transactions under inquiry.

*Katz v. Anderson (In re Anderson)*, 651 B.R. 82, 93 (Bankr. D. Conn. 2023) (quoting *In re*

*Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir. 1983)).

In evaluating these badges of fraud, the Court considers them as highly influential

factors; "[t]he presence of a single badge of fraud may spur mere suspicion; the confluence of

several can constitute conclusive evidence of actual intent to defraud." *Hirsch v. Steinberg (In re*

---

[4] Defendants do not contend that the transaction involved the transfer of an interest in the Debtor within a two-year timeframe, only that this element is covered by an affirmative defense (the earmarking doctrine).

*Colonial realty Co.)*, 226 B.R. 513, 522 (Bankr. D. Conn. 1998) (quoting *Acequia v. Clinton (In re Acequia, Inc.)*, 34 F.3d 800, 806 (9th Cir. 1994)).

The Court addresses the badges of fraud analysis cumulatively. To begin with, there is a genuine issue of material fact regarding whether the Debtor was insolvent at the time of the transfer, especially considering the state of its balance sheet, its ability to service its debts, its ability to pay payroll taxes, and the fact that it bounced numerous checks in the months leading up to the transfer. Plaintiff's Statement of Additional Facts at ¶¶ 94, 91, 92, 93. In any event, for the purposes of this analysis and in the light most favorable to the Trustee, the Debtor was certainly experiencing financial distress at the time of the transfer. Further, the facts put forth by the Trustee allow the strong inference that Patel and Johnson had a close professional and control relationship, both due to their former employer/employee relationship as well as their current positions in companies in a mentor/protégé relationship. *See, e.g.*, Plaintiff's Statement of Opposition Facts at ¶¶ 17, 22, 26, 32. In light of these considerations, and examining the facts in the light most favorable to the Trustee, there is a genuine dispute of material fact as to whether the Patel Construction Transaction was performed merely to reduce the Defendants' indemnity obligations under the NAS Bonds. *See* Plaintiff's Statement of Opposition Facts at ¶¶ 13, 71. Furthermore, the other significant portion of the loan was used to pay down the Everett Bank Loan and Everett Bank Line of Credit, on which the Defendants were also liable, also allegedly for the purpose of relieving them of that liability in the face of the Debtor's financial crisis. *See* Plaintiff's Statement of Additional Facts at ¶¶ 29, 83. This allegation would be fraudulent by extinguishing an avenue for creditors' recovery that would have increased the overall value of the estate to the creditors as a general matter. This is particularly stark in the context of the alleged consideration. The Trustee alleges the Debtor may have extinguished one debt by taking

on an increase of $417,405 in liabilities at a time when this would have seriously impacted the Debtor's balance sheet. Plaintiff's Statement of Additional Facts at ¶¶ 85, 94. As a result, it is unclear precisely the value of the consideration received by the Debtor, whereas the benefits gained by the Defendants in this transaction are far clearer.

More serious, however, are the allegations that the Avidia Bank Loan was procured through allegedly fraudulent representations about the assets and liabilities of the Debtor. *See, e.g.*, Plaintiff's Statement of Additional Facts at ¶¶ 46, 48, 52, 53, 55, 56, 60, 63. Assuming the resolution of this factual dispute in favor of the Trustee for the purposes of summary judgment, it would be indisputable under the badges of fraud analysis that the Defendants organized the transfer with an actual intent to defraud Avidia Bank by knowingly providing them with incorrect appraisal numbers to ensure the transfer transaction would occur. The fraud was therefore twofold: the inflated numbers not only made the business appear to have greater cash flow and assets than it did, ensuring the loan, but it also inflated the Redemption Price of the Defendants' shares in the Debtor such that it almost guaranteed the ability to pay down a substantial portion of the loans secured by the Defendants. With this understanding of the facts for purposes of summary judgment, the Trustee provides sufficient disputed facts such that there exists a genuine dispute of material fact as to whether the transfer was made with an actual intent to hinder, delay, or defraud a creditor. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to this element of Counts One and Three and summary judgment on this element of those Counts is unwarranted.

### 3. Constructive Fraudulent Transfer Claims

The elements of constructive fraudulent transfer under the Bankruptcy Code are that the debtor received less than a reasonably equivalent value in exchange for the transfer and one of the following: (i) that the debtor was insolvent at the time; (ii) that the debtor would have

unreasonably small capital after the transaction; (iii) that the debtor incurred debts beyond their ability to pay; or (iv) that the transfer was to an insider. The Trustee must prove the elements of constructive fraudulent transfer by a preponderance of the evidence. *Togut v. RBC Dain Correspondent Servs. (In re S.W. Bach & Co.)*, 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010); *Schneider v. Barnard*, 508 B.R. 533, 548 (E.D.N.Y. 2014).

Under CUFTA, the Trustee can prove constructive fraudulent transfer either under CUFTA § 52-552(e)(2) or § 52-552(f) by clear and convincing evidence. *See Neri Bros.*, 593 B.R. at 141; *see also Epperson v. Ent. Exp., Inc.*, 159 F.App'x 249, 252 (2d Cir. 2005). CUFTA § 52-552(e)(2) requires that the Trustee prove that the transfer was made without receiving reasonably equivalent value and either: (i) that the debtor would have unreasonably small capital after the transaction, or (ii) that the debtor incurred debts beyond their ability to pay. Alternatively, under CUFTA § 52-552(f)(a), the Trustee must prove that: (i) the debtor received less than reasonably equivalent value; and (ii) the debtor was insolvent at the time of the transfer.

To the extent these elements are duplicative of the elements of preferential transfer claims under Count Seven, those responses are considered incorporated herein. For clarity, the Court addresses each element asserted in turn.

a. *Reasonably Equivalent Value*

To decide whether funds were exchanged for a reasonably equivalent value, the court is required to determine the value of what was transferred compared to the value of what was received. There need not be dollar-for-dollar exchange, but "the court must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed by either issuer will have significantly harmed the innocent creditors."

*Coan v. Xin Chen (In re LXEng, LLC)*, 607 B.R. 67, 95 (Bankr. D. Conn. 1998) (quoting *Rubin v. Mfrs. Hanover Tr. Co.*, 661 F.2d 979, 994 (2d Cir. 1981)).

Here, the Defendants claim that the Debtor received a dollar-for-dollar reduction in obligations by taking on new obligations. The Trustee disputes the actual dollar-for-dollar reduction in the Debtor's liabilities given its precarious financial situation. The Trustee alleges that the transaction actually increased the Debtor's liabilities by $417,405 to pay off the NAS obligations, as well as the $1,168,488.13 balance of the Everett Bank Loan and Everett Bank Line of Credit. Plaintiff's Statement of Additional Facts at ¶¶ 13, 71, 83, 85. Furthermore, there is a question of material fact as to whether the Debtor received reasonably equivalent value for the repurchase of Patel Construction's equity in the Debtor. Given Patel's alleged misrepresentations as part of the appraisal of the Debtor, there is a material question of fact as to whether the Debtor repurchased that equity at a price that was far greater than what the shares were reasonably worth. *See, e.g.*, Plaintiff's Statement of Additional Facts at ¶¶ 46, 48, 52, 53, 55, 56, 60, 63. With this understanding of the facts for purposes of summary judgment, the Trustee provided sufficient disputed facts such that there exists a genuine dispute of material fact as to whether the transfer was made for reasonably equivalent value. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to this element of Counts Two and Four and summary judgment on this element of those Counts is unwarranted.

b. *The Insolvency of the Debtor*

In terms of the CUFTA claims, under Connecticut law, a debtor is presumed to be insolvent if they are not paying their debts as they come due under CUFTA § 52-552(c). As to insolvency under the Bankruptcy Code, courts analyze insolvency on the date of the transfer in question. *Pryor v. Tiffen (In re TC Liquidations LLC)*, 463 B.R. 257, 271 (Bankr. E.D.N.Y. 2011); *Sharp Int'l Corp. v. State St. Bank and Tr. Co. (In re Sharp Int'l. Corp.)*, 403 F.3d 43, 53 (2d Cir. 2005). The Bankruptcy Code defines "insolvent" as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property." Bankruptcy Code

§ 101(32)(A); *see also Duvall v. Cnty. of Ontario, N.Y.*, 83 F.4th 147, 152 (2d Cir. 2023). This test for insolvency is commonly known as a balance sheet test. *See, e.g., Silverman v. Paul's Landmark, Inc. (In re Nirvana Restaurant Inc.)*, 337 B.R. 495, 506 (Bankr. S.D.N.Y. 2006).

"Under the 'balance[ ]sheet insolvency' test, a court considers whether the fair value of the debtor's assets is greater than the fair value of the debtor's liabilities." *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 585 B.R. 41, 61 (Bankr. S.D.N.Y. 2018) (citing *Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 35–36 (2d Cir. 1996)); *see also Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC*, 402 F.App'x. 623, 627–28 (2d Cir. 2010) (applying *Roblin* to fraudulent conveyances); *see also Kim v. Yoo*, 776 F.App'x. 16, 21 (2d Cir. 2019). Furthermore, although it is preferred that determinations of insolvency are based on expert testimony, "appraisals are neither the exclusive nor dispositive means to make the determination." *Roblin*, 78 F.3d at 38.

> In order to conduct the balance[ ]sheet insolvency inquiry as described in *Roblin*, one has to calculate the fair value of the assets against the fair value of the liabilities. . . . *Roblin* emphasizes that the relevant value for the balance-sheet insolvency inquiry is "fair value," the value that a purchaser in the marketplace would ascribe to the asset or liability, not "book value."

*Lyondell*, 585 B.R. at 63.

The Second Circuit Court of Appeals also ruled in *Roblin* that the substantial additional evidence in the record was sufficient to conclude insolvency beyond the balance sheet test alone, including evidence of heavy losses in recent years and the tenuous state of the debtor's credit standing, among other considerations. *See Roblin*, 78 F.3d at 38. As a result, this issue turns, not on whether there is expert testimony on the matter—as Defendants contend is dispositive—but on whether the preponderance of the evidence bears for or against the insolvency of the Debtor in terms of the fair value of the Debtor's assets.

Here, the Debtor was indeed not paying its debts as they became due. *See, e.g.*, Plaintiff's Statement of Additional Facts at ¶¶ 45, 66. Additionally, the Trustee alleges that significant balance sheet irregularities render the Debtor insolvent in terms of the fair value of its assets and liabilities at the time of the transfer, regardless of what the Debtor's balance sheets may have stated. Plaintiff's Statement of Additional Facts at ¶ 94. The Trustee further alleges other indicia of insolvency, including the fact that the Debtor was frequently bouncing a number of checks in the months leading up to the transaction at issue here, that the Debtor's records reveal that the Debtor failed to pay payroll taxes in 2018 and 2019, and that the Debtor could not support debt service for the level of debt that the Debtor was carrying in 2019. Plaintiff's Statement of Additional Facts at ¶¶ 91–93. With this understanding of the facts for purposes of summary judgment, the Trustee provided sufficient disputed facts such that there exists a genuine dispute of material fact as to whether the transfer was made when the Debtor was insolvent under both the Bankruptcy Code and Connecticut law. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to this element of Counts Two and Four and summary judgment on this element of those Counts is unwarranted.

c.  *Insider Status*

Bankruptcy Code § 101(31)(B) provides the following non-exhaustive list of six statutorily designated insiders for corporations: directors, officers, persons in control of the debtor, partnerships in which the debtor is a general partner, the general partner of the debtor, or a relative of a general partner, director, officer, or person in control of the debtor.

Defendants contend that Patel Construction was not any of the statutorily designated entities such that it qualifies as an insider. "But in providing that the term insider 'includes' the statutory insiders, Congress made clear that 'insider' is not limited to these six categories. Thus, the statutory list is not exhaustive, and it is for the courts to define the limits of non-statutory

insider status." *Hirsch v. Tarricone (In re A. Tarricone, Inc.)*, 286 B.R. 256, 262 (Bankr.

S.D.N.Y. 2002) (citations omitted); *see also Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R.

438, 498 (S.D.N.Y. 1994) ("[C]ourts have uniformly held that the Bankruptcy Code's definition

is merely illustrative and that the term 'insider' must be flexibly applied on a case-by-case

basis").

> Courts will determine whether a party is an insider on an individualized basis based
> on the "totality of the circumstances." *In re Borders Grp., Inc.*, 453 B.R. 459, 469
> (Bankr. S.D.N.Y. 2011). Insider status has been partially defined as an ability to
> "exercise sufficient authority over the debtor to dictate corporate policy and the
> disposition of corporate assets or have at least a controlling interest in the debtor."
> *In re PHS*, 581 B.R. at 32 (internal citations omitted). In arguing that a party should
> be considered an insider, "the allegations must indicate something more than the
> monitoring of a debtor's operations and proffering advice to management." *In re
> KDI*, 277 B.R. at 511.

*Feltman v. Kossoff & Kossoff LLP (In re TS Empl., Inc.)*, 603 B.R. 700, 708 (Bankr. S.D.N.Y.

2019). "In determining whether a person is a non-statutory insider, courts have generally focused

on two basic factors: (1) the closeness of the relationship between the debtor and the transferee,

and (2) whether the transactions between the transferee and the debtor were conducted at arm's

length." *Tarricone*, 286 B.R. at 262. (citations omitted). "The analysis is a fact intensive one and

must be done on a case-by-case basis." *Id*. (citations omitted).

As discussed previously, Patel and Johnson had a professional relationship spanning

decades, including a current position of influence whereby Patel Construction agreed under the

MPA to serve as the Debtor's Mentor under the 8(a) program. Plaintiff's Statement of

Opposition Facts at ¶ 26. Even beyond the relationship between the professionals of both

companies, there is ample evidence in the record that the Defendants exercised an unusual

amount of control or influence over the Debtor and its finances. *See, e.g.*, Plaintiff's Statement of

Additional Facts at ¶ 32. As a result, the exact nature and degree of the connections between the

two companies and their respective controlling shareholders constitutes a genuine dispute of a material fact to determine insider status. Furthermore, construing the facts in favor of the Trustee, the fact that the Avidia Term Loan was taken out by the Debtor on the eve of bankruptcy—and negotiated by Patel on behalf of the Debtor—to pay off the loans secured by the Defendants calls into question the arm's length nature of the transaction as well, and is also indicative of control beyond monitoring the Debtor's operations and proffering advice by dictating the disposition of the Debtor's assets. With this understanding of the facts for purposes of summary judgment, the Trustee provided sufficient disputed facts such that there exists a genuine dispute of material fact as to whether the transfer was to an insider. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to this element of Counts Two and Four and summary judgment on this element of those Counts is unwarranted.

As a result, there exist genuine disputes as to numerous material facts regarding every required element of the intentional and constructive fraudulent transfer claims under Courts Two and Four of the Amended Complaint such that summary judgment would be unwarranted.

### 4.   Preferential Transfer (Reasonable Due Diligence)

In Count Seven of the Amended Complaint, the Trustee asserts a claim of preferential transfer under against Patel Construction. Bankruptcy Code § 547 requires the trustee to prove by a preponderance of the evidence that the alleged transfers were:

> 1) made to or for the benefit of a creditor; 2) for or on account of an antecedent debt; 3) while the debtor was insolvent; 4) within ninety days of the filing (or within one year of the filing if made to an insider); and 5) which enable the creditor to receive more than it would otherwise receive in a Chapter 7 liquidation case.

*Pereira v. Lehigh Savings Bank, et al. (In re Artha Management, Inc.)*, 174 B.R. 671, 676–77 (Bankr. S.D.N.Y. 1994); *see also Roblin*, 78 F.3d at 34.[5]

Due to the Court's previous findings that there exists a genuine dispute of material fact as to whether the Defendants are insiders, there also exists a genuine dispute of material fact as to whether Bankruptcy Code § 547(b)(4)(B) allows the bringing of this claim under the extended one-year time limit imposed on insiders such that summary judgment on this element is similarly unwarranted.

As to the contention that there is a reasonable due diligence requirement of this statute, Defendants argue that the addition of this language creates a new element of the Trustee's *prima facie* case. On this, Courts in the Second Circuit have held that:

> The "reasonable due diligence" language was added to Section 547 by the Small Business Reorganization Act of 2019. Small Business Reorganization Act of 2019, Pub. L. No. 116-54 § 3(a); *In re ECS Refining, Inc.*, 625 B.R. 425, 453 (E.D. Cal. 2020) (discussing amendment); *see also* Collier ¶ 547.02A. At least one bankruptcy court has held that it does create a new element for Section 547. *See ECS Ref.*, 625 B.R. at 454. Other courts have questioned that holding, but none seem to have squarely ruled otherwise. *See In re Insys Therapeutics, Inc.*, No. 19-11292, 2021 WL 5016127, at *3 (Oct. 28, 2021) ("[O]thers have suggested that a different conclusion than that reached by the *ECS Refining* Court may be warranted regarding due diligence constituting a new element of a section 547 claim. . . ."); *see also In re Trailhead Eng'g LLC*, No. 20-3094, 2020 WL 7501938, at *7 (S.D. Tex. Dec. 21, 2020) ("[T]he Court need not determine today whether 'reasonable due diligence' is an element of any preference claim. . . ."). Here, regardless of whether a new element has been created for a preference claim, the Trustee recounted that she performed diligence by reviewing Flywheel's books and records and other available information. (Complaint ¶¶ 38–39.) This would satisfy a due diligence element.

---

[5] As noted previously, the duplicative elements of a preferential transfer claim that were addressed previously are incorporated herein. The Defendants do not contend that the Trustee is unable to prove the following elements: 1) that the transaction was to or for the benefit of a debtor; 2) for or on account of an antecedent debt; or 5) that it would enable the creditor to receive more than it would otherwise receive in a Chapter 7 liquidation. Accordingly, the Court need not consider these elements.

*Tese-Milner v. Lockton (In re Flywheel Sports Parent, Inc.)*, No. 20-12157 (JPM), 2023 WL 2245382, at *4 (Bankr. S.D.N.Y. Feb. 27, 2023).

Defendants contend that the due diligence of the Trustee has not been reasonable such that her claim of a preference must fail under the statute. Based on the record before the Court and the complexity of the case and transfers involved, the Court is not convinced that the Trustee's demonstrated efforts fall below the standard of reasonable due diligence expected of a Trustee as delineated in *Tese-Milner*. The Trustee alleges she reviewed all documents produced by the Debtor's accountant prior to commencing the action. Plaintiff's Statement of Additional Facts at ¶ 5. This facially meets the *Tese-Milner* standard. Further, regardless of whether a new element is created, the very essence of an element that relies on reasonableness is factual and contextual in nature. Here, the degree and sufficiency of the Trustee's review of the Debtor's documents and records prior to the commencement of this action constitutes a genuine dispute of a material fact regarding this element. With this understanding of the facts for purposes of summary judgment, the Trustee provides sufficient disputed facts such that there exists a genuine dispute of material fact as to whether the Trustee performed proper due diligence as an element of a preferential transfer claim under Bankruptcy Code § 547. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to this special defense against Count Seven and summary judgment on this special defense on those Counts is unwarranted.

5.   <u>Transfer of an Interest in the Debtor (Earmarking Doctrine)</u>

The Defendants argue that the "earmarking doctrine" applies against both fraudulent and preferential transfer claims brought as Counts One, Two, Three, Four, and Seven. The "earmarking doctrine" is an exception to the general rule that a transfer by a debtor of borrowed funds constitutes a "transfer of an interest of the debtor in the property" such that a Trustee may

usually avoid that transfer. *See Cradle Co. v. Mangan (In re Flanagan)*, 503 F.3d 171, 184–85 (2d Cir. 2007). "The earmarking doctrine applies where a third party lends money to the debtor for the specific purpose of paying a selected creditor. . . . Where a debtor receives funds subject to a clear obligation to use that money to pay off a preexisting debt, and the funds are in fact used for that purpose, those funds do not become part of the estate and the transfer cannot be avoided in bankruptcy." *Id.* (quotations omitted). "There is, nonetheless, an important limitation on the earmarking doctrine. . . . Where a debtor replaces an unsecured obligation with a secured obligation, the payment is voidable to the extent of the collateral transferred by the debtor." *Id*. at 185–86.

As a result, the earmarking doctrine would not apply where, as alleged here, the Defendants' equity was swapped for a substantial amount of secured debt to Avidia Bank, thereby diminishing the value of the Debtor in exchange for alleviating Defendants' liability under the Everett Bank Loan, the Everett Bank Line of Credit, and the liability under the NAS Bonds, as well as a substantial increase in the Debtor's debts. *See* Plaintiff's Statement of Opposition Facts at ¶¶ 13, 71; Plaintiff's Statement of Additional Facts at ¶¶ 29, 83. Further, there is evidence that Avidia Bank did not place a clear obligation on the loan to pay off other creditors and that it provided the funds for, among other things, the "[b]uyout of partner, refinance of equipment, term out of line of credit, working capital, and closing costs." (ECF No. 81-1, Ex. H, at p. 1292 of 1305). The evidence on these matters provides a context where a genuine dispute of fact arises regarding the assertion that the Patel Construction Transaction was merely taking a loan to pay a loan, as required by the earmarking doctrine. With this understanding of the facts for purposes of summary judgment, the Trustee provided sufficient disputed facts such that there exists a genuine dispute of material fact as to whether the disputed

transaction provided funds under circumstances in which the exception to avoidability under earmarking doctrine would apply. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to this special defense against Counts One, Two, Three, Four, and Seven and summary judgment on this special defense on those Counts is unwarranted.

### 6.  Recoverability

The Defendants assert that the fraudulent and preferential transfer claims brought under Counts One, Two, Three, Four, and Seven are nonrecoverable under the provisions of Bankruptcy Code § 550.

Bankruptcy Code § 550(a) provides that "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made[.]" "[A] trustee seeking to recover under section 550(a)(1) against an entity for whose benefit a transfer was made must allege that (1) the entity was the intended beneficiary of the transfer, and (2) the intended benefit originated from the initial transfer." *Geltzer v. Salzman (In re ContinuityX, Inc.)*, 582 B.R. 124, 137 (Bankr. S.D.N.Y. 2018) (citations omitted); *see Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir. 1991). Further:

> "In order to establish liability for a transferee for whose benefit the transfer was made, the benefit must be direct, ascertainable and quantifiable and must correspond to, or be commensurate with, the value of the property that was transferred. Incidental, unquantifiable, or remote allegations of benefit are not sufficient." *Gowan v. Amaranth LLC (In re Dreier LLP)*, 452 B.R. 451, 466 (Bankr. S.D.N.Y. 2011) ([citations omitted]). The quintessential example of such an entity is a guarantor of the debt whose liability is relieved because the transfer satisfies the obligation of the primary obligor. *Id*. Reliance solely on the shareholders' status as such, without additional evidence of the transfer's direct benefit to them thus is insufficient.

*Tulis v. Gordos N. Restaurant Corp. (In re Gordos Restaurant Corp.)*, 643 B.R. 1, 35–36 (Bankr. S.D.N.Y. 2022) (citations omitted).

Defendants contend that the Defendants were not the *intended* beneficiaries of the transfer and merely *a* beneficiary. The Second Circuit Court of Appeals has ruled explicitly on this matter, however, pointing out that "we know that the 'entity for whose benefit' phrase does not simply reference the next pair of hands; it references entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds." *Christy v. Alexander & Alexander of N.Y. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey)*, 130 F.3d 52, 57 (2d Cir. 1997).

The Court deems that this is refuted by the Trustee to the extent that the entire thrust of the Trustee's complaint and argument asserts that the transaction was specifically intended to benefit the Defendants via a fraudulent loan. Furthermore, the Trustee does assert numerous disputed facts which provide evidence that the transaction was undertaken by the Debtor (and/or Patel) with the specific intent to benefit the Defendants and that that benefit originated from the original transfer.

This assertion is particularly clear in the context of the allegations that Patel misrepresented the assets and financial condition of the Debtor to Avidia Bank for the purpose of the Debtor's receipt of a disadvantageous loan to pay debts on which the Defendants were guarantors or otherwise liable, thereby relieving them of their liabilities under their guarantees. Plaintiff's Statement of Additional Facts at ¶¶ 46, 48, 53, 56, 57, 60, 63, 85. In the context of those factual assertions, the Defendants were the intended beneficiaries, and any benefits provided to the Debtor, NAS, or Everett Bank were merely incidental to the decrease in liability received by the Defendants. As a result, the Defendants have failed to meet their burden of proof

that there is an absence of evidence that the Trustee's claims are recoverable under Bankruptcy Code § 550(a). With this understanding of the facts for purposes of summary judgment, the Trustee provided sufficient disputed facts such that there exists a genuine dispute of material fact as to whether the Defendants were the intended beneficiaries of the transaction. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to this special defense against Counts One, Two, Three, Four, and Seven and summary judgment on this special defense on those Counts is unwarranted.

### C.  Breach of Fiduciary Duty Claims Against Milan Patel and Patel Construction and the Aiding and Abetting Breach of Fiduciary Duty Claim Against Patel

In Count Five of the Amended Complaint, the Trustee asserts a claim for breach of fiduciary duty against both Patel and Patel Construction, as well as a claim of aiding and abetting breach of fiduciary duty in Count Six against Patel alone.

In order to prove a claim for breach of fiduciary duty, a plaintiff must establish "(1) the existence of a fiduciary relationship, giving rise to a duty, (2) breach of that duty, (3) causation, and (4) damages." *Barash v. Lembo*, 348 Conn. 264, 301, 303 A.3d 577, 600 (2023). To prove a claim for aiding and abetting fraud, the Trustee must prove: "(1) the existence of an underlying tort; (2) defendant's actual knowledge of the underlying tort; and (3) defendant's provision of substantial assistance in the commission of the underlying tort." *In re Bayou Hedge Funds Inv. Litig.*, 472 F.Supp.2d 528, 532 (S.D.N.Y. 2007) (citing *Cumis Ins. Soc., Inc. v. Windsor Bank & Tr. Co.*, 736 F.Supp. 1226, 1234 (D. Conn. 1990)).

The Trustee points out that a fiduciary relationship is contextual by nature:

> A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other. The superior position of the fiduciary or dominant party affords him great opportunity for abuse

of the confidence reposed in him.

*Saint Bernard School of Montville, Inc. v. Bank of America*, 312 Conn. 811, 835, 95 A.3d 1063,

1077 (2014) (quoting *Dunham v. Dunham*, 204 Conn. 303, 322, 528 A.2d 1123, 1133–34 (1987),

*overruled in part on other grounds by Santopietro v. City of New Haven,* 239 Conn. 207, 682

A.2d 106 (1996)).

Defendants contend that courts in Connecticut have generally declined to hold that

minority shareholders have a fiduciary duty to other shareholders. *See Wittman v. Intense

Movers, Inc.*, FSTCV 166030430S, 2018 WL 5898965, at *2 (Conn. Super. Ct. Oct. 24, 2018).

The Defendants' reliance on this case alone in support of this legal proposition is misplaced. The

court in *Whittman* relied on negative inferences of Connecticut law. Specifically, the court in

*Whittman* states that:

> The plaintiff has relied upon *Lux v. Environmental Warranty, Inc.*, 59 Conn. App.
> 26, 39 (2000), and other authorities for the proposition that mere status as a
> shareholder, and especially as a minority shareholder, does not create a fiduciary
> duty to other shareholders. *Lux*, however, relies on other cases, implicitly
> distinguishing status as a minority shareholder from status as an officer or director.
> Thus, *Lux* cites *Banks v. Vito*, 19 Conn. App. 256, 262 (1989), but does so in a
> reverse inference sense—that earlier decision states that "[a]uthority exists in this
> state for officers, directors, and majority shareholders to be held personally liable
> for breach of fiduciary duty when evidence shows a misappropriation of corporate
> funds for personal benefit . . ." In other words, *Banks* implicitly excludes minority
> shareholders when describing the fiduciary duty of shareholders, but then identifies
> status as an officer or director as potentially implicating a fiduciary duty.

*Id. Whittman*, however, is an outlier case. The proper reading of *Whittman*—in the broader

context of the larger tapestry of Connecticut case law on fiduciary duty cited herein—is therefore

that minority shareholder status *alone* may not create a presumption of the existence of a

fiduciary relationship, but that that duty may arise in the context of additional factors.

Moreover, the Trustee points out that the law is not so clear-cut regarding whether the

mere titular relationship between the parties is dispositive in determining whether a fiduciary

43

duty exists. In fact, the Connecticut Supreme Court has explicitly held that:

> "Although this court has refrained from defining a fiduciary relationship in precise detail and in such a manner as to exclude new situations . . . we have recognized that not all business relationships implicate the duty of a fiduciary. . . . In particular instances, certain relationships, as a matter of law, do not impose upon either party the duty of a fiduciary.
> . . .
> "In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence."

*Biller Assocs. v. Peterken*, 269 Conn. 716, 723–24, 849 A.2d 847, 851–852 (2004) (quoting *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38, 761 A.2d 1268, 1278 (2000)).

The Defendants contend that, as a minority shareholder, Patel Construction and, through that entity, Patel, conclusively, had no fiduciary duty to other shareholders as a matter of law. The facts, as alleged by the Trustee, detail the Defendants' particular relationships with the Debtor; Patel Construction served as the SBA Mentor for the Debtor under the MPA and Patel was the former employer of the Debtor's principal. Similarly, as noted previously, Patel's involvement with the Debtor's appraisal and the Debtor's finances as a whole call into question the arm's length nature of the parties' dealings. These facts give rise to a genuine issue of material fact as to whether a special relationship or a relationship of dominance or dependance existed that gave rise to a fiduciary duty. *See, e.g.*, Plaintiff's Statement of Additional Facts at ¶ 17. Similarly, as the Defendants only contend that the aiding and abetting claim is improper because there was no underlying tort, there is the additional related factual issue of whether Patel, as sole member of Patel Construction, aided and abetted any breach of that fiduciary duty.

The Defendants have not provided any evidence of an absence of a genuine dispute of material fact as to the remaining elements of the breach of fiduciary duty claim or the attendant aiding and abetting claim. Therefore, there exists a genuine dispute of material fact as to all

remaining elements of the breach of fiduciary claim and the aiding and abetting claim. With this understanding of the facts for purposes of summary judgment, the Trustee provided sufficient disputed facts such that there exists a genuine dispute of material fact as to whether the Defendants breached its fiduciary duty to the Debtor and, relatedly, whether Patel aided and abetted Patel Construction's alleged breach of fiduciary duty. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to any element of Counts Five and Six and summary judgment on the elements of those Counts is unwarranted.

### D. CUTPA Claims

In Count Eight of the Amended Complaint, the Trustee alleges a violation of the Connecticut Unfair Trade Practices Act ("CUTPA") under Conn. Gen. Stat. § 42-110b against both Patel and Patel Construction.

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Further, these provisions are meant to be construed according to "interpretations given by the Federal Trade Commission Act (15 [U.S.C. §] 45(a)(1)), as from time to time amended." Conn. Gen. Stat. § 42-110b(b).

The Connecticut Supreme Court has interpreted these instructions to mean that:

> "[T]o prevail in a private cause of action under CUTPA, a plaintiff must establish that the defendant has (1) engaged in unfair methods of competition or unfair or deceptive acts or practices (2) in the conduct of any trade or commerce, (3) resulting in (4) an ascertainable loss of money or property, real or personal, by the plaintiff.

To determine whether a practice is unfair, the Connecticut Supreme Court has adopted the Federal Trade Commission's interpretations of the law, specifically:

> [W]e have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public

policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. . . . In order to enforce this prohibition, CUTPA provides a private cause of action to [a]ny person who suffers any ascertainable loss of money . . . as a result of the use or employment of a [prohibited] method, act or practice. . . ."

*Landmark Inv. Grp., LLC v. CALCO Const. & Dev. Co.*, 318 Conn. 847, 880–881, 124 A.3d 847, 867 (2015) (quoting *Ulbrich v. Groth*, 310 Conn. 375, 409–410, 78 A.3d 76, 100 (2013)).

This Court's prior analysis in this opinion of the allegedly fraudulent conduct also serves to highlight the alleged unfair actions of the Defendants such that it concludes that there also exists a genuine dispute of material fact regarding the CUTPA claims. *See, supra,* Section IV.B.2–3.

Additionally, while Defendants contend that CUTPA does not apply to intracorporate actions, the alleged unfairness also involves conflicts of interest and collusion between numerous outside entities such that this alleged limitation of CUTPA is largely immaterial. The unfairness here is not relegated to the transaction between a majority and minority shareholder, but also involves alleged fraud against other creditors involved in the Patel Construction Transaction, as well as other creditors of the Debtor that were not intracorporate entities. *See, e.g.,* Plaintiff's Statement of Opposition Facts at ¶ 13.

With this understanding of the facts for purposes of summary judgment, the Trustee provided sufficient disputed facts such that there exists a genuine dispute of material fact as to whether the Defendants engaged in unfair trade practices. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to any element of Count Eight and summary judgment on the elements of that Count is unwarranted.

### E.  Turnover Claims

In Count Nine of the Amended Complaint, the Trustee asserts a claim of turnover of property of the estate under Bankruptcy Code Section 542(b) against Patel Construction.

Bankruptcy Code § 542(b) provides that:

> [A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

Bankruptcy Code § 542(b). "Although we have discerned no meaningful distinction between setoff rights that may derive from common-law principles and contract versus those that are moored in statute it is clear that a setoff does not occur automatically but, rather, it must be exercised affirmatively." *OCI Mortg. Corp. v. Marchese*, 255 Conn. 448, 462, 774 A.2d 940, 949–950 (2001) (cleaned up). Further, Defendants erroneously rely on the "right of setoff" discussed in *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 19 (1995). The case also provides that "a setoff has not occurred until three steps have been taken: (i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff." *Id*.

As to the remaining factual issue in this claim, the Trustee provides some evidence of a debt of $158,329 owed to the Debtor by Patel Construction and never repaid. This information comes from the Debtor's financial records. Plaintiff's Statement of Additional Facts at ¶ 20. The Defendants do not provide any evidence that the claim was paid off or of its current value, nor do the Defendants provide any evidence of the completion of the three steps required for a setoff to occur under *Strumpf*. With this understanding of the facts for purposes of summary judgment, the Trustee provided sufficient disputed facts such that there exists a genuine dispute of material fact as to whether Patel Construction owes a debt to the Debtor. As a result, the Defendants have not clearly established the absence of a genuine dispute of material fact as to all elements of Count Nine and summary judgment on the elements of that Count is unwarranted.

## V.    CONCLUSION

For the reasons set forth above, this Court finds that the granting of Defendants' Motion for Summary Judgment is unwarranted as the Defendants have not clearly established the absence of genuine issues of material fact as to any of the Nine Counts asserted in the Trustee's Amended Complaint. Accordingly, the Motion is denied.

**IT IS SO ORDERED** at Hartford, Connecticut this 22nd day of January 2024.

*James J. Tancredi*
United States Bankruptcy Judge
District of Connecticut